And we appreciate all the arguments in the case. We'll move on to the final case set for argument today, Jeffords v. Navex Global, that's case number 23-35271. Mr. Carter, you may proceed. May it please the Court, good morning. May I reserve four minutes for my rebuttal? Adam Carter with the Employment Law Group on behalf of Valerie Jeffords. This is an ADA case, and there was no flexible interactive process between my client and Navex, that's conceded. There was no job description, importantly, that was used or made available either to my client or to her doctors, against which they could map her ability. Okay, so let's accept both of those premises as true. Her doctor submits a statement that says she can't work until June or July, two months later, after the FMLA leave had expired, right? Right, the February 28th is what, Your Honor? If- Sorry, the April 28th. April 28th, and said she can't come back till June. June 17th. Yeah. What basis did the doctor have to write that statement if your position is the doctor didn't even know what the essential job functions were? Well, that's right. Navex only gave the doctors the forms that, and asked the question that Navex wanted to ask. And our question for the court is, can an employer simply fail to engage in the interactive process, which this court has said is the heart of the ADA? Can they just- I thought the interactive process was about reasonable accommodations. The interactive process is about two things, and Judge Gould's concurrence in Barnett makes it very clear. The request for reasonable accommodation is for the employee. The whole question of undue hardship is for the employer. Those parties have differing information with respect to the issue at hand. So, for example, whether an employee can or can't lift 10 pounds, the employee's in the best position to know that. Whether an employer has other jobs or other positions or economic hardship or, in this case, COVID-19. I may have this backwards, so correct me. But I would have thought that the plaintiff, in this case your client, would have had to come in and ask for reasonable accommodations. And then the interactive process starts. No, Barnett makes clear that two things, either you can request it, that makes it easy, that didn't happen here. But the employer can know of the client's need for, has disabilities and of their need for accommodations. And that triggers the interactive process. What did the client know? I mean- What did the employer know? Yeah, sorry, what did the employer know about what reasonable accommodations could have been done or whatnot? Excellent question. So, what we have is we have the traumatic brain injury in December 2018. Then my client is working for 11 months on the job. And gets promoted to senior vice president and doing well. But then in the fall, December time frame, November, December time frame of 2019, starting to be foggy, missing a day or two here and there, and decides, I really need to address this, and then goes and takes four weeks of leave. That four weeks turns into eight weeks, eight weeks turns into 12 weeks.  It's not. Yeah, I mean, the symptomology can take up to two years to reveal it. And indeed, that's the case here. So, and to your honor's earlier point, this is a big case to my client. She was making 300K and she had a ten year old daughter, she's a single mom. And if she's out of a job, as of a given day, because her doctors don't answer the question right, or fill out the form right, she's out of luck. And here's the point. And I don't run from those forms. The doctor's interest is in trying to get her the leave. So she didn't have any participation in filling out the forms? She told her doctors, I need the form filled out, yes. There's evidence that on the April 28th, this is after termination, that she went and had it filled out, filled in the form, and then had her doctor sign it. He testified that he agreed with the points that were made in it. And the essence of this is the date on which all of this should have happened is on March 16th, the day that she's terminated. At 8 AM, they're on the phone terminating her and not engaging in the interactive process. But if the employer had been told by the doctors that she can't return to work on March 16, and then later learned it wasn't gonna be any earlier than June. For ADA purposes, doesn't that render her not a qualified individual, sufficient to trigger the protections of the ADA? No sir, our argument is that additional leave beyond the 12 weeks is an accommodation. This court said that in Humphrey, Humphrey, yes. Then she's requesting- But to what degree? Right. No, my friend on the other side makes it seem as though this was some indefinite leave that she was requesting. Well, it was two months. I mean, you're saying the ADA inherently extends the protections of the FMLA. No, I'm not saying that. I'm saying that these are done separately. The FMLA is its own 12 weeks. Here, we're talking about an interactive process that everyone agrees never took place, and that additional leave could have been a solution to the problem. Could it have been two weeks? Could it have been three weeks? Could she have ramped up, started off part-time? We're talking about whether she- I would give you that, except for the fact that you have a doctor's statement  Your Honor- I don't think the employer is thinking, oh, we need to pressure test the doctor. Maybe she really can come back. Maybe, you know, we better call her and see whether she really can come back. Your Honor, the whole question is, what does come back mean? As of March 16th, we were all working in our pajamas at home on March 16th, 2020. And so coming back meant being available on the phone, being available to- But that's what, I mean, the doctor sent a note and said, can't do it. But, Your Honor, the doctor also- That was February 28th. That's before the pandemic. The governor of Oregon has sent everybody home on March 8th. So my argument is that the world changed importantly. The world changed importantly. And the job duties and restrictions in this case changed dramatically as of that moment. And whatever the doctors had said, the employer cannot just sit back. The employer, and this court has said in Morton and other cases, this is a fact-intensive, particularized discussion that needs to take place. Counsel, I think you'd have a powerful argument, were it not for the fact that, based on the medical record that the employer had at the time, she was not cleared to return to work, period. The question is, what does return to work mean? What were the facts? What was my client capable of doing? We know that she wasn't capable of going to the grocery store. She couldn't drive. She couldn't get to the bricks and mortar office. But she was fine to work from her bedroom. She was safe to work from her bedroom. She could have answered calls. Well, yes and no. I mean, there were these restrictions. Oh, go ahead, Judge Gould. My question is this. I thought that the FMLA expressly provided that once the leave, that the employee had a right to leave, and then second, that once the leave was over, then the employee had a right to be reinstated or restored if the employee could work at that time with or without reasonable accommodations. So here, if the employer, if the leave ends and the employer doesn't inquire about accommodations that would permit work, does that violate the FMLA? The FMLA, our argument on the FMLA is that the violation happened earlier and by not allowing her to be reinstated and instead terminated on the morning that the FMLA is expiring. So that's our argument on the FMLA. But importantly... But she wasn't saying that she could start work on March 17th. I'm quite clear on that point. And that's where the ADA then steps in. I agree. I think you've got to look at them separately. But I think under the FMLA, as Judge Gould just outlined what the statute provides, she had exhausted the remedies that the FMLA provides. So now we have to look at the ADA claim. Agreed. And I... But to Judge Gould's question, our argument on FMLA interference is when she's asking the questions about the FMLA on March 10th during FMLA and then the employer is ghosting her and not answering those questions, we believe that that is interference. Let me go back to my ADA argument just while I have the time. As a practical matter, what difference would it make if we sent the ADA claim back and ruled that she'd exhausted her remedies under the... FMLA. FMLA, thank you. As a practical matter, what difference would it make? She would still litigate under the ADA whether she could have returned to work with reasonable accommodations, right? That's right. And the damages structure, if I'm being candid, is better under the ADA than under the FMLA. The FMLA is a corollary to the Equal Pay Act, and so that would be right. But let me just walk through what I think is the clear argument. Additional time of some length is a reasonable accommodation. That's Humphrey. She requests some additional leave, whether it's before March 16th and they know it or it's on March 16th when she sends that letter, and that's at 5902 of the record. We know there was no interactive process here. That's conceded. And my opponent defends their choice on the grounds of futility. And what Morton teaches in this court is that the futility is for the employer to prove, and that was not what happened here. There are material facts in dispute in this record that were not generated in this record because the employer never engaged in the interactive process. The employer never called the health care providers, never had my client go meet their own doctor, never spoke to my client. But, counsel, I mean, this is where I struggle with your argument. I think you've got some equities here, but I just think you're placing way too much of a burden on the employer. I mean, at some point, all your client had to do, it's not a heavy burden, is just say, hey, I could do this work now. I could... Or even say, I'm asking for a reasonable accommodation, I'll be back at work in two months, let's have a discussion about that. That didn't happen. And a jury is needed to sit down and talk. This employer was holding the job open. I've got a very strong set of facts here that the employer was holding... It's on tape that they're holding the job open. So there's no need. The ordinary incentive for the employer is, I need to fill a job that's unfilled. I've got a very important executive that I need to replace. That's not the case here. So I think I should be able to put on that evidence and tell a jury about those facts. I'll reserve the remainder of my time. Thank you, counsel. Thank you, Your Honour. May it please the Court. My name is Megan Crowhurst. I represent NAVX Global Inc. I'm here today with Chief Legal Officer Sean Ramey and Associate General Counsel and Compliance Officer Mark Robertson. NAVX respectfully requests that this Court affirm the well-reasoned decision of the District of Oregon. There are two issues in this case, and both of those issues have already been decided by this Court's Ninth Circuit precedent. The first is related to the FMLA. At the time that Ms. Jeffords' leave expired, her 12 weeks of continuous leave, Ms. Jeffords' health care providers did not release her to return to work in any capacity, with or without an accommodation, from home or otherwise. They simply said she was unable to perform her job. And one of those health care providers determined that that was from present to TBD. In other words, indefinitely, unlike what... But one of them did say she could come back on June 17th, correct? So, there were two types of forms that were submitted. The first was the FMLA Med-Cert. That's the one where Dr McNally said that she would be incapacitated TBD. The second form was a medical certification that Dr. Zielinski submitted, and that was for affirming that she would be eligible for short-term disability benefits. The only way that she could have received short-term disability benefits is if her doctor certified that she was unable to perform any work, and that is the reason why she could even, you know, accept those benefits. So, when Dr Zielinski submitted the short-term disability medical certification form to Cigna, the disability insurer, in that form, he said she would be eligible to... In his best estimate, she could potentially return to work in... It was three months, because the form was completed on March 3rd, and so the anticipated return-to-work date would have been sometime in mid-June. At that time, that's all NAVACs had to rely upon, and as was clear in the record, Ms. Jeffords' position, she was a senior vice president of global services, and so her job, she managed hundreds of employees in this role, the essential functions of her job required high level of cognitive function, required her to be able to use really constant use of a computer, particularly if she was going to be working from home, and the ability to read and respond to emails, all of that. It is imperative and cannot be understated the timing of all of this, Your Honours, the fact that her medical leave, or her FMLA entitlement, the 12 weeks of her leave, expired on March 13th of 2020. Of course, that was on the eve of Governor Brown's Stay Home, Save Lives order, and there is testimony, of course, that NAVACs, as the good business that it was, had already been in the process of business recession planning, because it was already well aware that this pandemic was going to impact its business operations. So it was in that context that the executive team at NAVACs needed to make a decision on whether or not it could hold a high-level executive's job open for another three months during that time period. And that, Your Honours, it's important to understand that the court is permitted to consider the entire period of the leave for which she was asking. So she'd already expired three months, and now her doctor was saying at the earliest she would need another three months. Okay, so this is moving into the ADA claim, though, right? Um, absolutely. So, Your Honours, the FMLA claim, I think, is really quite apparent. Well, and I think even opposing counsel sort of agrees, at least agrees that the ADA claim is the stronger claim, and I think that that's probably true. So I want to be clear about what the responsibilities here are under the ADA, because there are some support for what you're saying. You're reading this. A doctor says, can't come back for three months. You're like, holy cow, we've got an executive. An executive team. The executive team that may have helped, assisted in making this decision, or as a whole? No, well, like, she was an executive at the company, right? She was in senior leadership. Senior, so, like, at what level would she have been? She was a senior vice president of global services. And so would she have been one of the top 10 in the company, or one of the top 50 in the company, or? Likely one of the top 10. Okay, so, do you agree that extended leave under the ADA could be a reasonable accommodation? Of course. There are circumstances. In fact, as my opponent cited in their briefing, the Nunes case, the clear... What was the leave in that? How much leave was being requested there? I believe it was eight months of leave, but the important distinction is not the period of time of the leave. It was the fact that in the Nunes case, the employee was a Walmart retail worker. And so the Ninth Circuit... There was a lot more ability for the company to... They're more fungible than one of the top 10 in the company. Totally understood. Of course. Here's the complaint that they're making, and I want to hear your response to it. Why didn't you have this conversation? Why didn't you go back and say, listen, you know, we would love to accommodate you. We already have. We can't do this for three months. You are at such senior leadership. We just can't allow you not to return for two more months. It's not... Or an indefinite period. You never did that, correct? They did have that conversation. That was on March 6th, the Monday following the... And she said, and she said, sorry, I just can't come back until at least June. I don't know if she used those words, but the idea was that on the morning of Monday, March 16th, which her leave exhausted on Friday, March 13th. So that morning when they called her, they asked her how she was doing. She recorded the conversation. Navix was not aware of that, but it came up during the court's discovery. Is it in the record before us? You know, I was wondering about your honor, because I believe we submitted it to the district court as part of either we did or they did. And I think it was submitted as an audio transcript. And I was realizing as I was sitting back here, I'm not sure if it was submitted to this court in that manner, if at all, because it was not formally transcribed, but I know that... That would be relevant to whether there was this iterative process that the appellant seems to be complaining about, correct? Yes and no, because the reality is, as your honors understand, at the time her FMLA leave exhausted, the only information before Navix was the fact that she could not return to work in any capacity, not even... Well, that's the information we've looked at, but if there's a recording of her making representations to the company, I think that would be relevant to whether there was additional information. Like if she said, oh, I understand your concerns now, let me take this under advisement and figure out if there's something I could do, that would be relevant. That's not what she said during the call. But you would agree that that would be relevant here? Potentially, but at the same time, I think the employers are well aware that according to this court's precedent, Department of Labor's regulations, the employer cannot second guess the medical opinions of the doctors presented. Even if the employee says, ignore my doctor, I can do this job, the employer is not allowed to do that. The employer is not allowed to call up the doctor. The employer is not allowed to challenge it. And most certainly, the employer, under no circumstances, can go back to the employee after providing a doctor's note saying that they cannot perform the job and say, here, could you take this back to your doctor again and tell him you need to perform the job. That's exactly what these statutes are designed to prevent. No, I understand that, but I just wonder, anyway, I'd love to hear the recording. I don't know how we get to it, but. Well, I just wanted to ask if it were the case, wasn't it in that conversation that she said she wasn't sure she could even go to the grocery store? Exactly, and that does get to that. And the district court did address that in the lower court's ruling. The district court said, although she claims that on that call, she was cogent, she was coherent, she could have performed the job from home, the district court, as well as NAVX, think that that recording actually shows quite the opposite. In fact, during the call, when they checked in with her and let her know that they would be ending her employment based on the medical records, when they asked her, how are you doing, she said, I can't even walk straight. I can't walk without holding a wall. I can't brush my teeth. I don't even know what I'm doing half the time. I'm unable to leave the house. So there really is no question that she did not say at that time during that call, hey, can you give me just another two more months? But even if she had, in the context of her senior leadership position and all of the Ninth Circuit precedent in this case, there was no reason why the employer necessarily needed to continue to hold the job open for three months. There are, again, the Nunez case, right? There are certainly some- If it's a lower level line employee that's more fungible. No, I totally understand that. Does a reasonable accommodation, I think the answer is no, but does a reasonable accommodation include sort of a demotion where you could say, okay, we can't keep you on in this job, but you're very qualified. We'd love to keep you on in a job that's more fungible and we'd love to keep you on if you could do that. Does that include a reasonable accommodation or only has to be the C-level job we're talking about? No, of course a company can determine, can have that as an interactive process. You know, hey, we've got this other job. But again, the medical certification that she had in front of her said she couldn't perform any job. She was unable to return to work and that is why she was eligible to receive the short-term disability benefits. And we think- I think Judge Gould. Judge Gould, if I could interject a question, please. I would certainly understand there's sufficient evidence for the employer if you had a trial and the court said that. But my question, what bothers me about this case? Was it being resolved by a summary judgment? So I would like you to address why there's no genuine fact issue that could affect the outcome of this trial. Yes, thank you, Your Honor. Well, the district court relied upon the Ninth Circuit precedent to demonstrate that where an employee has presented medical certification that says they are unable to perform the essential functions of the job with or without a reasonable accommodation, they're therefore not a qualified individual under the ADA. And those cases include Anthony versus Tracks. That's the Ninth Circuit opinion in 2020 that expressly says that an employer is obligated to engage in the interactive process only if the individual is otherwise qualified or can perform the job with or without, or can perform the essential functions of the job with or without a reasonable accommodation. And in this case- There's no evidence in this case that the employer identified the essential functions of the job. Well, yeah, yes, Your Honor. So the FMLA certification actually is really clear, and the lower court addressed that as well, because what the FMLA certification says, and I'm gonna read this, is that if the employee is, if the employer fails to provide a list of the employee's essential functions of a job or a job description, answer these questions based upon the employee's own description of his or her job functions. So again, Ms. Jaffer and the lower court acknowledge this, right? Nobody's in a better position to know the essential functions of the job than the employee themselves, and so the employee is supposed to communicate with their doctor what the essential functions of their job are if there is no job description, and that's all within the FMLA's regulations. And I think that, in addition, the only, the very first medical certification that was provided at all to NAVX that said she could work from home was the one that she submitted. It was a fitness for duty certification. It was, she wrote it, as Mr. Carter clarified, she wrote it, she had her doctor sign it. It was dated April 28th of 2020. It was submitted to NAVX on May 9th. That's six weeks after the termination of her employment, and even that certification said I could return to work in June to work from home, which is a very different premise than Mr. Carter's suggesting to the court. It wasn't until six weeks after her termination she submitted anything at all that said she could return to work, and even that, which is dated April 28th, contradicts an April 30th short-term disability medical certification that Dr. Zielinski submitted that also said she was unable to perform her work at all, not released to return to work, and it's critical that your honors understand that the reason Dr. Zielinski was certifying those short-term disability benefits was so that she could get paid, basically, and he had to certify she was unable to work in order for her to get those benefits. So the only thing, before termination, it looks like it's on March 9th, Dr. Zielinski certified that she was not released for work, and he estimated that she could return to work with restrictions in three months. Correct. That's the best, looking at the facts, most favorable to Jeffords, that's the best facts that the company had to rely on at that time. Correct. So the real question we have to decide is does that trigger some sort of iterative process, does that trigger some iterative process from the company? Did they have a duty, before terminating her, based on that knowledge, to say, well, and your point is, no, they had the doctor's note, that's enough. Correct, and there's numerous Ninth Circuit precedent already that we've submitted in our briefing, in addition to the Anthony versus Trax case, Kennedy versus Applause, and Kaplan, and there's just a lot of precedent for this, and I think it can't go understated, your honor, that Navax is a software company that offers compliance services to businesses, including employment law. So when the executive team made this decision, they did so relying on the Ninth Circuit precedent. They're not unintelligible about ADA and FMLA, they did this based on the regulations, the EEOC's guidance, and the Ninth Circuit precedent, all of which we put before your honors, and that is why, frankly, the lower court decided on summary judgments, that if you can't rely on all of that case law to make this decision, you shouldn't be able to go before a jury. I mean, certainly, the arguments were strong enough. Okay, thank you, counsel. Thank you so much. May it please the court, if I heard Ms. Crowhurst correctly, I think she's taking the position that March 16th, the morning call, is an interactive process. That is not the case. It was, and there is a transcript of the call. It is in the record. It's volume two, starts at page 165. It's a transcript of the call. The call itself, Ms. Crowhurst is right, was also in the record, but we put the transcript before to make it easier on the court. But that is not- And what is it in the transcript that you think changes what Dr. Zielinski said on March 9th, which is she can't return to work at all for three months? So first of all, on March 9th, or it's actually filling it out on March 3rd, but Dr. Zielinski doesn't know about the pandemic coming, and he doesn't know- So what was said, just tell me what was said on the call that is different than the information they had from the doctor. So let's step back, and Ms. Crowhurst tried to go through on the job duties. I'm gonna answer Your Honor's question, but consistent use of a computer. Is there any accommodation on that? Read emails. I just want to know what she said. Okay, I'll just go read the transcript. No, no, no. What she said, and what's clear from the transcript, it's true, I need to hold the wall. I can't go to the grocery store. Those kinds of things. It's not an interactive process about what emails she can read, or whether she can be on a phone call. The doctor said on March 9th, she had to limit screen time and avoid reading. It did say that, and again, that was filled out on March 3rd, but I would- But COVID meant that you don't have to look at screen time, and you don't have to read anymore? But Your Honor, no. But let's say an executive goes blind and cannot read, then the employer has an accommodation to have their email read to them. If the employee has a disability that they cannot be on screen time, then they have things read to them. These are questions that the jury needs to ask, and the employer can then take the position that, I see I'm out of time, let me just finish the thought, that the employer then gets to weigh in on whether or not this is an undue hardship. And as I said, I've got a very strong record here that the employer was in no rush to have to fill this position. Okay. I thank Your Honor. Yeah, thank you. Thank you to both counsel for your arguments. That concludes our session for the day and the week, and we're adjourned.
judges: GOULD, TALLMAN, NELSON